## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CIVIL CASE NO. 15-CV-21050-RWG
### (CRIMINAL CASE NO. 12-CR-20570-JEM/RWG)

YESENIA POUPARINA,

                **Petitioner,**

   **v.**

UNITED STATES OF AMERICA,

                **Respondent.**

_____/

### RESPONSE BY THE UNITED STATES TO
### PETITIONER'S MOTION PURSUANT TO 28 U.S.C. § 2255

The United States of America, by and through its undersigned attorney, respectively

submits this Response to Petitioner Yesenia Pouparina's ("Petitioner") Motion Under 28 U.S.C.

§ 2255 to Vacate, Set Aside, or Correct Sentence by a person in Federal Custody (the "Motion").

(*See* Civil Docket Entry #1.)  Petitioner's claims are without merit and do not form any basis for

relief; accordingly, the Court should deny Petitioner's Motion in its entirety without conducting

an evidentiary hearing.

### I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On August 2, 2012, Petitioner was indicted by a grand jury sitting in the Southern District

of Florida on four counts of wire fraud, in violation of 18 U.S.C. § 1343, and one count of mail

fraud, in violation of 18 U.S.C. § 1341, in connection with her scheme to obtain the proceeds of

a fraudulent Home Equity Conversion Mortgage ("HECM") loan in the name of her mother,

Rebeca Petitioner, for Petitioner's own property located at 14210 SW 16th Terrace in Miami (the

"HECM Property").  (Indictment, Criminal Docket Entry #1, attached as Exhibit A.)  A HECM

loan (also commonly referred to as a "reverse mortgage") is a Federal Housing Administration

("FHA"), U.S. Department of Housing and Urban Development ("HUD") insured loan intended

to allow older individuals to use equity in their homes to supplement their income and remain in

their residence. Essential eligibility requirements to for a HECM loan include: (1) being at least

62 years old; (2) being a primary resident of the home for which the individual is seeking the

reverse mortgage; and, (3) having substantial equity in the home at the time of the loan closing.

During the investigation of Petitioner's fraud, at the time of the indictment, and during

the months immediately following the indictment, counsel for the government was Prosecutor

McCarthy. (The undersigned entered her appearance in October of 2012, and together with

Prosecutor McCarthy prepared the case for trial and conducted the trial.)

Petitioner was aware that was the subject of a federal investigation in 2012 and retained

counsel. Prior to seeking an indictment from the grand jury, Prosecutor McCarthy engaged in

plea negotiations with Petitioner's first retained criminal defense counsel of record, Frank

Quintero, Jr. On or about April 16, 2012, Prosecutor McCarthy sent a proposed plea offer to

Attorney Quintero. (*See* April 16 Plea Offer, attached as Exhibit B.)   It contemplated entry of a

guilty plea by Petitioner to one count of wire fraud, and included a provision under which the

parties would agree to a recommended sentence within the advisory range of the U.S. Sentencing

Guidelines—specifically, a base level of 7 pursuant to U.S.S.G. § 2B1.1(a) + 14 levels for losses

greater than $400,000, but less than $1,000,000 pursuant to U.S.S.G. § 2B1.1(b)(1)(H) + 2 levels

for abuse of a position of trust or use of a special skill pursuant to U.S.S.G. § 3B1.3 = offense

level of 23, as well as a provision stating that Petitioner would be entitled to a three-level

reduction in her calculated sentencing guideline offense level pursuant to U.S.S.G. § 3E1.1,

based upon Petitioner's recognition and affirmative and timely acceptance of personal

responsibility, resulting in a total offense level of 20 (33-41 months assuming Criminal History Category I).  (*Id.*)

Two days later, on or about April 18, 2012, following a telephone negotiation between Prosecutor McCarthy and Attorney Quintero, a revised plea offer, subject to final approval by the prosecutor's supervisor, was provided via electronic mail to Attorney Quintero.  (*See* April 18 Plea Offer, attached as Exhibit C.)  Under the April 18 Plea Offer, Petitioner would plead guilty to conspiracy in violation of 18 U.S.C. § 371, a statute which carries a statutory maximum sentence of only five years—significantly less than that authorized under wire fraud statutes. (*See id.*)  In addition, under the April 18 Plea Offer both parties would agree to recommend a lesser sentence under the guidelines, and the government acknowledged that it was amenable to the possibility that Petitioner might be eligible for § 5K1.1 credit if she substantially cooperated with investigators.  (*See id.*)

On or about April 24, 2012, Attorney Quintero informed Prosecutor McCarthy via electronic mail that his "client [Petitioner] has decided to respectfully decline your offer" but that Petitioner had "authorized [Attorney Quintero] to make the counter-offer set out below."  (*See* April 24 Quintero Email, attached as Exhibit D.)  In sum, the counter-offer authorized by Petitioner envisioned Petitioner cooperating with the Government's investigation and forfeiting a percentage of the funds seized from multiple bank accounts that she controlled but escaping all criminal liability and avoiding criminal charges of any kind.  (*See id.*)

On or about June 7, 2012, Prosecutor McCarthy rejected Petitioner's counter-offer.  (*See* June 7 McCarthy Email, attached as Exhibit E.)

On or about August 15, 2012, following Petitioner's indictment, Attorney Quintero withdrew from the case.  Within the following month, Prosecutor McCarthy provided

Petitioner's newly-retained counsel, Greg Chonillo, Esq., with correspondence reflecting the proposed plea offers and counter-offer. (*See* McCarthy Emails Forwarding Plea Offers, attached as Exhibits F, G, H.) In addition, Prosecutor McCarthy sent a new proposed plea offer to Attorney Chonillo on or about September 13, 2012. (*See* September 13 Plea Offer, attached as Exhibit I.) Under its proposed terms, Petitioner would plead guilty to Count 1 of the Indictment (wire fraud), and both parties would agree to a recommended sentence under the guidelines—specifically, a base level of 7 pursuant to U.S.S.G. § 2B1.1(a) + 12 levels for losses greater than $200,000, but less than $400,000 pursuant to U.S.S.G. § 2B1.1(b)(1)(G) + 2 levels for abuse of a position of trust or use of a special skill pursuant to U.S.S.G. § 3B1.3 + 2 levels for obstructing or impeding the administration of justice pursuant to U.S.S.G. § 3C1.1 = offense level of 23, as well as a provision stating that Petitioner would be entitled to a three-level reduction in her calculated sentencing guideline offense level pursuant to U.S.S.G. § 3E1.1, based upon Petitioner's recognition and affirmative and timely acceptance of personal responsibility, resulting in a total offense level of 20 (33-41 months assuming Criminal History Category I). (*Id.*)

Telephone discussions and electronic mail correspondence regarding a potential plea and its terms continued on into October of 2012 at which time the trial was continued for the first of two times. (*See* Emails Discussing Terms of Potential Plea Offers, attached as Exhibits J and K.) In addition, counsel approached the government, including the undersigned, 1-2 days prior to the commencement of trial in January 2013 in an attempt to secure a favorable plea offer for Petitioner, but no agreement was reached.

The case proceeded to trial on January 28, 2013, and the jury returned its verdict on February 5, 2013, convicting Petitioner on all counts. (*See* Criminal Docket Entry #90.) Also on

4

February 5, 2013, both parties presented the jury with evidence regarding the forfeiture count contained in the indictment and, after a significant deliberation, the jury unanimously found those proceeds forfeitable.

Following a lengthy sentencing hearing on August 22, 2013, Petitioner was sentenced to forty-six (46) months of imprisonment and a term of three years of supervised release. (*See* Sentencing Transcript at 43.) During the sentencing hearing, the District Court found that the actual loss number associated with Petitioner's fraudulent conduct was approximately $208,000 and, pursuant to U.S.S.G. § 2B1.1(b)(1)(G), enhanced Petitioner's base offense level by only 12 levels, as opposed to the 14-level enhancement posited in the government's memorandum and argued in the alternative by the government at sentencing (*see id.* at 39-40). The District Court also applied the 2-level enhancement for abuse of position of trust or use of a special skill under U.S.S.G. § 3B1.3 given Petitioner's position as a title agent (*see id.* at 5-6). The resulting total offense level of 21 coupled with Petitioner's Criminal History Category of I yielded a guidelines range of 37 to 46 months. During the sentencing hearing, the District Court heard from several witnesses on Petitioner's behalf, including her minor children who offered emotional pleas for leniency.

The judgment of conviction, along with a judgment of forfeiture against Petitioner in the amount of $207,810.94, was entered on August 22, 2013. (Criminal Docket Entry # 147.)

Petitioner appealed to the Court of Appeals for the Eleventh Circuit, asserting that her sentence was unreasonable; more specifically, Petitioner claimed that the District Court had erred in calculating the applicable loss amount of her fraud in three ways:

(1) The sentencing court did not exclude $44,000 paid in closing costs associated with the HECM loan and failing to do so violated Application Note 3(D)(i) of § 2B1.1 which provides

that "[l]oss shall not include. . . [i]nterest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs;"

(2) The sentencing court did not credit against her loss the fact that she satisfied a $115,000 mortgage on her property, which she claimed increased the property's value as collateral for the loan; and

(3) The sentencing court erred by concluding the loss amount was the same as the amount of restitution requested by the Government.

The Court of Appeals affirmed the sentence without hearing oral argument, addressing each of Petitioner's meritless claims:

(1) "With respect to Petitioner's first contention, the district court correctly concluded that Application Note 3(D)(i) of § 2B1.1 did not require it to exclude from the actual loss approximately $44,000 in closing costs that Petitioner paid when she secured the HECM loan in 2009.  The purpose of that application note is to ensure that 'the offense level for a financial crime is not increased if the prosecution is delayed, even though the delay increases the cost of the crime.'  Closing costs are not explicitly mentioned in Application Note 3(D)(i) and they do not qualify as 'other similar costs' within the meaning of that application note here because the closing costs were a fixed amount that was incurred only when the loan was originally taken out. Those costs would not have increased if the prosecution delayed bringing its case, so they do not fall within the scope of Application Note 3(D)(i);"

(2) "As for Petitioner's second contention, the district court did not clearly err when it refused to apply a credit against loss for the $115,000 payment that Petitioner made, as a condition to obtaining the HECM loan, to satisfy an existing mortgage on her property.

Petitioner was entitled to (and received) a credit against loss for the approximately $216,000 that her lender recovered when the property was sold;" and

(3) "Finally, the district court did not clearly err when it determined that the loss amount would be the same as the amount of restitution that it was ordering.  When the § 2B1.1(b)(1) loss amount is calculated based on actual loss instead of intended loss, as it was in this case, one would expect the amount of restitution and the loss amount to be the same."

*United States v. Pouparina*, No. 13-14045, 577 Fed. Appx. 939, 941 (11th Cir. Aug. 19, 2014) (unpublished).

Petitioner filed this motion for collateral relief on April 23, 2015.  The Petitioner has not previously filed a motion under 28 U.S.C. § 2255 or received a related evidentiary hearing.

## II.    **PETITIONER'S CLAIMS FOR RELIEF UNDER SECTION 2255**

Petitioner's Motion purports to set forth five "grounds" that she claims entitle her to collateral relief; however, four of the five grounds comprise multiple issues which the government makes its best effort to distill and summarize here: (1) Petitioner was misadvised by an attorney prior to indictment to enter into a short sale of the HECM Property and that she was prejudiced as a result; (2) Petitioner's trial counsel—Attorney Chonillo— misadvised Petitioner about the consequences she faced at trial, including her potential loss amount, and was ineffective in counseling her to proceed to trial; (3) Petitioner's trial counsel—Attorney Chonillo—was ineffective in preparing for trial and during trial; (4) Petitioner's sentencing counsel was ineffective in preparing for and during the sentencing hearing with respect to presenting mitigating factors; and (5) Petitioner's sentencing counsel was ineffective at sentencing in connection with the loss calculation. *See* Motion, generally.

7

III.   **LEGAL STANDARD**

Pursuant to 28 U.S.C. § 2255, a prisoner in federal custody may move the court which imposed her sentence to vacate, set aside, or correct the sentence if it was imposed in violation of federal constitutional or statutory law, was imposed without proper jurisdiction, is in excess of the maximum authorized by law, or is otherwise subject to collateral attack. *See* 28 U.S.C. § 2255. Under Section 2255, unless "the motion and the files or records of the case conclusively show that the prisoner is entitled to no relief," the court shall "grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect t." *Id.*

In order to proceed with her Section 2255 petition, however, a petitioner "must allege reasonably specific, non-conclusory facts that, if true, would entitle [her] to relief." *Georges v. United States*, 2012 WL 602659, at *2 (S.D. Fla. Jan. 12, 2012) (citing *Aron v. United States*, 291 F.3d 708, 714-15, n.6 (11th Cir. 2002)). No evidentiary hearing is warranted on a 2255 motion where the petitioner's claims are "affirmatively contradicted by the record," constitute "unsupported generalizations," or are "patently frivolous." *Holmes v. United States*, 876 F.2d 1545, 1553 (11th Cir. 1989) (internal quotations omitted).

With regard to claims of ineffective assistance of counsel, "Bare and conclusory allegations of ineffective assistance which contradict the record and are unsupported by affidavits or other evidence do not require a hearing." *Georges*, 2012 WL 602659, at *2 (citing *Chandler v. McDonough*, 471 F.3d 1360, 1363 (11th Cir. 2006)). *To sustain a claim for ineffective assistance, a petitioner must demonstrate "both (1) that [her] counsel's performance was deficient, and (2) that [s]he suffered prejudice as a result of that deficient performance."* *McDowell v. United States*, 2012 WL 5906892, at *1 (citing *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984) (emphasis added). Courts evaluate an attorney's

8

performance based on one requirement: "that counsel make objectively reasonable choices." *McDowell*, 2012 WL 5906892, at *2 (citing *Reed v. Sec'y, Fla. Dep't of Corr.*, 593 F.3d 1217, 1240 (11th Cir. 2010) (citation omitted)). "A court must "judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct. *Id.* (citing *Roe v. Flores-Ortege*, 528 U.S. 470, 477 (2000) (citation omitted)). The judicial scrutiny of an attorney's performance is "highly deferential, and the court adheres to a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (citing *Strickland*, 466 U.S. at 689-90)). Prejudice requires showing a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

## IV.   ARGUMENT

None of the grounds raised by Petitioner in her Motion entitles her to relief because as to each ground she plainly fails to meet the standard set forth in *Strickland*. She is not entitled to an evidentiary hearing, and Petitioner's Motion should be denied in its entirety.

### A.   Petitioner's "Ground One": Short Sale Advice

Petitioner claims in Ground One, and again as part of a separate set of allegations in Ground Five, that she was "misadvised" by an attorney, William Tunkey—who did not represent her in any capacity during any stage of her criminal trial, sentencing or appeal—into entering into a short sale of the HECM Property which was the subject of the fraud with which she was later convicted. *See* Motion at 4, 15. Petitioner complains that proceeds of the short sale ultimately were used to bolster the guideline calculation and so she was prejudiced by his alleged advice. *Id.*

9

The right to effective assistance of counsel is a right that emanates from the Sixth Amendment. *See, e.g.*, *Strickland*, 466 U.S. at 684-86. Very simply, the Sixth Amendment right to counsel attaches "at the first appearance before a judicial officer at which a defendant is told of the formal accusation against [her] and restrictions are imposed on [her] liberty." *Rothgery v. Gillespie County*, 554 U.S. 191, 194 (2008). Once the right attaches, it applies at all "critical stages of the criminal proceeding." *Missouri v. Frye*, 132 S.Ct 1399, 1405 (2012) (internal quotations omitted).

The short sale took place on or about February 7, 2012. *See* Indictment, Exhibit A, at 6. Petitioner was indicted on August 2, 2012, and she was arraigned on August 15, 2012. *See* Criminal Docket Entry #9. Thus, Petitioner entered into the short sale approximately six months before her Sixth Amendment right to effective assistance of counsel had attached, and she has no valid constitutional claim entitling her to relief from her criminal conviction.

Petitioner's reassertion of her Ground One claim in Ground Five—where she states that she entered into the short sale of the HECM Property on the advice of counsel (presumably Attorney Tunkey)—does nothing to bolster her claim or change the fact that she is not entitled to collateral relief from her sentence relief on the basis of advice from an attorney who played no role in representing Petitioner at any stage of trial. Petitioner did not raise an advice of counsel argument during trial or appeal in relation to the short sale of the HECM Property,[1] much less

---

[1] To be able to assert the defense of good faith reliance on counsel's advice, a defendant must show "(1) that he or she fully disclosed to his attorney all material facts that are relevant to the advice for which he consulted the attorney; and (2) thereafter, he relied in good faith on the advice given by his attorney." *United States v. Hill*, 643 F.3d 807, 851 (11th Cir. 2011) (finding that a defendant cannot qualify for an instruction regarding this defense without satisfying the two underlying elements) (other citations omitted). The defendant bears the burden of proof on the issue. *United States v. Vernon*, 723 F.3d 1234, 1269 (11th Cir. 2013) (citing *United States v. Eisenstein*, 731 F.2d 1540, 1543-44 (11th Cir. 1984)).

make a showing that she disclosed fully to Attorney Tunkey the fraudulent circumstances under which Petitioner came into possession of the HECM Property, which is the crux of her criminal conviction in this case. Petitioner's motion for relief on the ground that she was misadvised to enter into a short sale of the HECM Property does not entitle her to any form of collateral relief and should be dismissed as to such grounds.

**B.     Petitioner's "Ground Two": Pre-Trial**

Petitioner claims that that one of her two retained trial counsel, Attorney Chonillo, "misapprised her of the full range of consequences that she would face" if she proceeded to trial—more specifically asserting that she was told that the applicable loss in the case was $4,000 with a corresponding guidelines range of 0-6 months—and that Attorney Chonillo "failed to advocate aggressively as promised" once she had decided to exercise her right to go to trial. *See* Motion at 6. Petitioner acknowledges that she made the decision to proceed to trial but states that she was confident in doing so because Attorney Chonillo "would provide her with the defense she needed." (*Id.*)

Other district courts to consider claims like Petitioner's have said that "[i]t is clear that where the prosecution has proffered a plea agreement, a defense attorney must inform his client about the proposed plea agreement, and that failure to do so constitutes ineffective assistance of counsel." *Goudie v. United States*, 323 F.Supp.2d 1230, 1327 (S.D. Fla. 2004). Beyond that, courts have noted that the "case law does not clearly define how much and what kind of information must be conveyed to a defendant in order to satisfy the performance prong of the *Strickland* standard." *Goudie v. United States*, 323 F.Supp.2d 1230, 1330 (S.D. Fla. 2004). It has been recognized that it is "preferable" for counsel to discuss the guidelines and a petitioner's possible sentencing exposure when counsel presents the plea offer. *See id.* at 1334.

11

Attorney Chonillo was not deficient in his representation of Petitioner during the pre-trial plea negotiation phase, nor can Petitioner demonstrate prejudice, and her generalized claim that she did not appreciate the consequences of challenging the indictment at trial fails. First, Attorney Chonillo was not the first counsel to discuss potential plea offers made by the government with Petitioner. Petitioner was involved in reviewing and even authorizing counter-offers to proposed plea offers made by the government before she was indicted and before she retained Attorney Chonillo, as evidenced by the correspondence between Attorney Quintero and Prosecutor McCarthy. *See, e.g.*, Exhibit D. The plea offers that were the subject of the correspondence plainly included guidelines calculations and a loss amount of at least hundreds of thousands of dollars. *Id.*

Moreover, Petitioner does not dispute that after her indictment Attorney Chonillo showed her the then-current plea offer—indeed, her Motion states that she "review[ed] the Plea Agreement" and made the decision to go to trial. Motion at 6. It defies logic that Petitioner could, after reviewing and discussing with various counsel multiple plea offers, fail to apprehend that the consequences flowing from a decision to proceed to trial might be worse than those set forth in plea offers (the best of which offer still contemplated a sentencing range of 24-30 months of imprisonment, *see, e.g.,* Exhibits C and I). *Accord Ramirez v. United States*, 286 F. Supp. 2d 243 (S.D.N.Y. 2003) (petitioner failed to state claim for ineffective assistance of trial counsel in negotiating plea agreement where petitioner asserted understanding of terms and consequences of plea agreement).

Moreover, in an affidavit sworn to by Attorney Chonillo, *see* Chonillo Affidavit, attached as Exhibit L, he makes clear that prior to the commencement of trial, Petitioner repeatedly was advised of the risks of electing to proceed to trial. Attorney Chonillo attests that "on multiple

12

occasions, [he] discussed with and counseled Ms, Pouparina about her amount of loss." *Id*. at 2. At one point during the pre-trial representation, according to Attorney Chonillo's affidavit, he employed a potential loss amount of $4,000 as an illustrative example in order to discuss the U.S. Sentencing Guidelines to Petitioner, but at no point did Attorney Chonillo suggest that $4,000 represented the actual loss amount in Petitioner's criminal case—where the HECM loan involved exceeded $400,000—nor did he suggest that Petitioner's sentencing range was 0 to 6 months. *Id.* Instead, Attorney Chonillo attests that on several occasions he emphasized the amount of loss that Petitioner was facing, and that if the loss amount was adopted by the District Court, it would expose Petitioner "to several years of prison time if she went to trial and was found guilty." *Id.* Attorney Chonillo further attests that he told Petitioner that she faced grave risks if she proceeded to trial, and he, along with co-counsel Alejandro De Varona, "pressed and pleaded with [Petitioner] not to proceed to trial on several occasions." *Id.*

Even if Attorney Chonillo for some unknown reason ignored the evidence with which he was provided in discovery and further disregarded the past and current proposed plea offers from the government contemplating a loss in the hundreds of thousands of dollars, *see* Exhibit I, and "misadvised" Petitioner that her sentencing exposure would only be 0 to 6 months based on a loss amount of $4,000, Petitioner's claim still fails. Petitioner cannot meet the second prong of the *Strickland* test because she cannot show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Goudie*, 323 F. Supp. 2d at 1327 (citing *Strickland*, 466 U.S. at 694).

Courts have emphasized that a "[p]etitioner cannot show prejudice simply by asserting in hindsight that [she] would have accepted a plea agreement had it been properly presented to [her]. . . ." Rather, a petitioner must offer the Court objective evidence in order to satisfy the

prejudice prong of the *Strickland* analysis. *Goudie*, 323 F. Supp. 2d at 1335 (citations omitted). Here, Petitioner has offered no such objective evidence; she has only offered the bare assertion that she was misadvised, and even then she still does not claim that she would have pleaded guilty had she been properly advised. She merely states that she made the decision to proceed to trial based on her confidence in defense counsel. *See* Motion at 5.

Furthermore, even if Petitioner can show that she would have accepted the plea offer but for counsel's "misadvisement," Petitioner still cannot show that she was prejudiced as required under *Strickland*. In *Goudie*, for example, the court considered a case in which the defendant was advised about a plea for a misdemeanor when the defendant actually faced a felony charge. 323 F. Supp. 2d at 1331. The reviewing court compared the defendant's expected exposure at the time he rejected the plea offer with his ultimate sentence and found that there was little difference. 323 F. Supp. 2d at 1335-36. The *Goudie* court found that the disparity did not rise to the level of potential prejudice, noting that it was informed by two other cases: one in which the actual sentence that the defendant faced was 12 to 17 years higher than the estimate he received, *see United States v. Gordon*, 156 F.3d 376, 380 (2d Cir. 1998) (finding prejudice), and another in which the disparity between the ultimate sentence and the expected sentence was between 65 and 79 months, *see Cullen v. United States*, 194 F.3d 401, 402 (2d Cir. 1999) (finding evidentiary hearing required).

The sentencing range that Petitioner claims in Ground Two of her Motion Attorney Chonillo conveyed to her was 0 to 6 months. *See* Motion, at 5. She ultimately faced 37-46 months after conviction at trial, and was sentenced to 46 months. *See* Sentencing Transcript, Exhibit L, at 43. Thus, the disparity between her expected exposure and her ultimate exposure was between 31 and 46 months. That disparity is substantially less than the lower than the

14

defendants in both *Gordon* and *Cullen*—the disparity is almost two years lower at its lowest

level. *See Goudie*, 323 F. Supp. at 1336. Also, in comparison to *Cullen*, Petitioner's exposure if

she had pled guilty actually would have been largely the same as it was after going to trial and

being found guilty. *See* Exhibit I. The proposed plea offer conveyed to Attorney Chonillo in the

instant case carried a total guidelines level of 20, equating to a sentence of 33 to 41 months, only

one level below what she faced post-conviction. *See id.*

Given that Petitioner is unable to demonstrate both that Attorney Chonillo's performance

was deficient, and that she was prejudiced by his advice, she fails to meet the standard required

by *Strickland* to establish ineffective assistance of counsel, and her motion should be denied with

respect to this ground.

### C.    Petitioner's "Ground Three": Trial

Petitioner asserts that Attorney Chonillo was ineffective in preparing her case for trial

and during the trial itself. More specifically, she claims that Attorney Chonillo did not meet with

her for an adequate time leading up to trial, that she was required to pay fees in cash, that

Attorney Chonillo was not successful in entering all defense exhibits into evidence and that he

did not present an expert at trial (although an expert in what Petitioner does not say), that

Attorney Chonillo somehow prevented her from testifying, and that Attorney Chonillo was

somehow unaware of the forfeiture portion of the trial proceeding. *See* Motion at 8.

First, Petitioner's claims as to her trial counsel's preparation of her defense are belied by

Attorney Chonillo's affidavit. Paragraphs 8 and 9 of the affidavit make clear that Attorney

Chonillo "reviewed all of the discovery throughout the course of several months beginning in

August of 2012 and reviewed and prepared for actual trial a month in advance of the of the

original trial date in September, 2012." Chonillo Affidavit, Exhibit L, at 3. When the matter

15

was continued until in or about December 2012 (and the trial commenced in January 2013), "once again, Affiant and Mr. De Varona began trial preparations one month early." *Id.* In addition, Petitioner's second retained counsel Alejandro De Varona "was intimately involved in all trial preparations and reviewed trial strategy with Ms. Pouparina." *Id.*

Moreover, as to Petitioner's unsubstantiated claim that her counsel fees somehow entitle her to relief, courts have found that without alleging specific, non-conclusory, facts to the contrary, disputes regarding a defendant's fee arrangement with counsel do not form the basis of an ineffective assistance of counsel claim. *See Lamonda v. United States*, 2013 WL 6145427, at *9 (M.D. Fla. Nov. 21, 2013) (finding that when the defendant alleged a conflict of interest based on the fact that his brother was paying his attorney's fees, he merely speculated that the arrangement adversely affected his defense, and his speculation was contradicted by the record in that his attorney zealously represented him throughout his case, including by filing numerous pre-trial motions, extensively cross-examining the Government's witnesses, making appropriate objections, and presenting testimony and evidence in support of defendant's defense); *see also LaLonde v. United States*, 2012 WL 4466528, at *3 (S.D. Fla. Sept. 27, 2012) (finding that when the defendant alleged that his counsel would not continue to represent him unless he paid an additional sum of money, causing the defendant to plead guilty, that allegation was unsupported by the record and conclusory). Petitioner says nothing about how an arrangement to pay counsel in cash or paying fees for additional trial exhibits rises to the level of a constitutional or fundamental violation entitling her to collateral relief.

Second, in Ground Three of her Motion, Petitioner complains in part about her trial counsel's tactics—whether it be a decision not to employ an expert or introducing documents into evidence. Effective assistance does not mean that counsel is required to "pursue every path

until it bears fruit or until all hope withers." *Georges*, 2012 WL 602659, at \*2 (quoting *Rogers v. Zant*, 13 F.3d 384, 387 (11th Cir. 1994)). But rather, the question is whether an attorney made a reasonable tactical decision, because if so, that is in the attorney's discretion. *Georges*, 2012 WL 602659 at \*2 (quoting *Fugate v. Head*, 261 F.3d 1206, 1219 (11th Cir. 2001) (citation omitted)). "Reasonable tactical decisions are given a strong presumption of correctness, and the inquiry is generally at end." *Mills v. Singletary*, 63 F.3d 999, 1024 (11th Cir. 1995) (citation omitted). The Eleventh Circuit has found that in a situation that is not prejudicial *per se*, a defendant's failure to identify specific, non-speculative information that would have been revealed but for the attorney's actions, there is insufficient evidence to find that the defendant was prejudiced. *See Aldrich v. Wainwright*, 777 F.2d 630, 636-37 (11th Cir. 1985) (finding no prejudice in a situation where the attorney did not interview or take depositions of the State's witnesses for impeachment purposes because the defendant could not identify any specific information that would have been revealed by those depositions or interrogatories and that would have added to the impeachment of the State's witnesses). Petitioner has not identified what sort of expert she believes would have helped her at trial or what documents that Attorney Chonillo should have attempted to move in evidence at trial. She does not come close to establishing a deficient performance by her counsel and offers nothing by way of information that would have been revealed and inured to her benefit had certain actions been undertaken.

Third, with respect to the claim that counsel was unaware of a forfeiture proceeding, as set forth in Attorney Chonillo's affidavit, both he "and Mr. De Varona gave Ms. Pouparina the choice to have the forfeiture issue heard by the Jury or by the Judge which is customary and argument was made and based on the guilty verdict, after significant time deliberating the jury rendered the decision to forfeit her assets. Affiant and Mr. De Varona knew at all times that it

17

was part of the trial." Chonillo Affidavit, Exhibit L, at 3.   Of course, as reflected in the

sentencing transcript, Mr. De Varona made a reasonable argument to the jury as to forfeiture and,

indeed, the jury deliberated for approximately two hours on the issue before rendering its special

verdict. *See* Trial Transcript, Vol. 6 at 99-100, 101, 116.

Fourth, Petitioner was not prevented from testifying.   To prevail on an ineffective

assistance claim premised on trial counsel's alleged refusal to allow a client to testify, the

petitioner must do more than just assert that her lawyer refused to allow him to testify.   "It is

extremely common for criminal defendants not to testify" and a defendant merely claiming that

she was denied the right to testify in her own defense is thus "too facile a tactic to be allowed to

succeed." *Underwood v. Clark*, 939 F.2d 473, 475 (7th Cir. 1991).   "In a subsequent collateral

attack on the conviction the defendant must produce something more than a bare,

unsubstantiated, thoroughly self-serving, and none too plausible statement that his lawyer (in

violation of professional standards) forbade [her] to take the stand." *Id.* at 476.   This Petitioner

has not done in her Motion.

Attorney Chonillo attests to the fact that, while he advised Petitioner not to testify

(following a mock cross examination), he told her that "ultimately the decision not to testify

could not be made by counsel and that she retained the ultimate decision." Chonillo Affidavit,

Exhibit L, at 3.  Moreover, the District Court expressly informed the Petitioner at trial on the

record that the decision was hers alone as to whether or not she should testify, and to which she

responded that she understood. *See* Trial Transcript, Vol. 5 at 9-10.  Petitioner's claim of

ineffective assistance of counsel on this ground is simply a "barebones assertion," insufficient to

warrant habeas relief. *Underwood*, 939 F.2d at 476. *See United States v. Smith*, 235 F. Supp. 2d

418, 424-425 (E.D. Pa 2002) (defendant was not entitled to habeas relief based upon ineffective

18

assistance of counsel, because defendant was made aware of right to testify and chose not do to so).

Finally, a plain reading of the trial transcript serves to further undermine all of Petitioner's "Ground Three" allegations—not only the unsupported claim that she was somehow prevented from testifying at trial by Attorney Chonillo. Attorneys Chonillo and De Varona were zealous advocates on Petitioner's behalf as evidenced by their aggressive cross examinations of all government witnesses, the defense witnesses called, the evidence that was moved in by defense counsel and the more than a dozen sidebars that occurred, many of which were heated exchanges regarding the admissibility of evidence. Following five full days of trial—concerning a mortgage fraud as to a *single* property—the presiding judge went out of his way to compliment counsel not only for their "congeniality and civility" but also for the "commendable job" counsel did in presenting the case. Trial Transcript, Vol. 6 at 120-121. Petitioner's bare and conclusory allegations as to trial counsel's performance fail to meet either prong of the *Strickland* test, and Ground Three should be denied.

### D.     Petitioner's "Grounds Four and Five": Sentencing

Petitioner claims that she also was denied effective assistance of counsel at sentencing. Included among her various alleged failings of counsel in Ground Four are the following: sentencing counsel failed to argue the guidelines are advisory and deprived the court consideration of the 3553(a) factors; counsel failed to investigate mitigating factors; and counsel failed to argue "exigent factors as to loss calculations o[r] present any other grounds for departure." Motion at 9. Ground Five also alleges that sentencing counsel was ineffective but, aside from that conclusory allegation at the outset of her claim, it serves as nothing more than an effort by Petitioner to relitigate the amount of loss that was found by the District Court and the

19

resulting sentence imposed which was affirmed by the Eleventh Circuit Court of Appeals. This the Petitioner cannot do in a motion for collateral relief. Neither Grounds Four nor Five, the latter of which is merely cloaked as a constitutional claim, entitles Petitioner to relief, and her Motion should be denied as to these bases.

As an initial matter, Petitioner in Grounds Four and Five is complaining not about Attorney Chonillo or Mr. De Varona (both trial counsel), but rather about her fifth defense counsel of record in the case, Percy Martinez. In short, Petitioner's claims set forth in Ground Four are factually untrue and belied by the record and, thus, in no way entitle her to relief. The sentencing briefs submitted to the District Court and transcript of the August 22, 2013 sentencing hearing make clear that Attorney Martinez raised numerous issues on Petitioner's behalf, most significantly, the loss amount as calculated in the Presentence Report, as well as a two-point enhancement for use of a special skill. *See generally* Sentencing Transcript. Over the course of a 90-minute sentencing hearing, Attorney Martinez argued forcibly to the District Court that Petitioner should not be sentenced based on a loss amount grounded in intended loss. Ultimately, although the District Court did not adopt defense counsel's position whole cloth, the District Court did reduce the loss amount that it initially stated it would apply by two levels— from a 14 level enhancement to a 12 level enhancement, thereby reducing Petitioner's exposure under the guidelines. *See* Sentencing Transcript at 42-43.

As to Petitioner's assertions that Attorney Martinez was somehow ineffective for not explaining the fundamental precepts of federal sentencing to the District, the District Court is well aware of both the advisory nature of the Sentencing Guidelines as well as its duties to consider the factors set forth under 3553(a). And, if there were any doubt, the District Court stated the following on the record before imposing sentence:

The Court is fully informed of the facts and circumstances surrounding the crime, and no legal reason has been shown as to why the sentence should not now be imposed. Moreover, the Court has considered the statements of all the parties, undertaken a complete review of the pre-sentence investigation report, has ***reviewed and considered the advisory guidelines***, and ***has considered the factors set forth in 18 U.S.C. 3553(a) paragraphs 1 through and including 7***.

Sentencing Transcript at 40-41 (emphasis added).

With respect to the presentation of mitigation on Petitioner's behalf, it is difficult to comprehend how Petitioner can advance such a claim given the record. Notably, Petitioner does not offer with any level of specificity what factors that sentencing counsel could have, but failed, to present in mitigation. The District Court stated that it had reviewed the many letters "submitted to [it] by various members of the family and friends and two or three of the children," *Id.* at 29; moreover, Petitioner's minor children emotionally addressed the District Court during the sentencing hearing, Sentencing Transcript at 29, 30. Friends of Petitioner's also addressed the District Court, pleading with the court to "consider [Petitioner] as a person and the relationships that she has with other people in her life and how this has all been punishment enough." *Id.* at 31. Other family members, including Petitioner's sister who also wrote a letter on Petitioner's behalf, made their presence and support known to the District Court. *See id.* at 33. In sum, Petitioner had ample mitigation presented on her behalf by counsel at sentencing and his performance did not come close to meeting an ineffective standard; sentencing counsel's course of action was reasonable (indeed, the sentencing court chided sentencing counsel for trying to advance *too many* arguments, some of which were considered factual issues already decided at trial). *See Chandler v. United States*, 218 F3d 1305 (11th Cir. 2000) (defense counsel reasonable and not ineffective for failing to call character witnesses at sentencing where counsel called petitioner's wife and mother to testify, advanced two statutory mitigating factors and stressed lingering doubt about petitioner's true guilt).

In Ground Five, Petitioner primarily seeks to relitigate the loss amount that the District Court found was properly attributable to her following her fraud conviction, including the District Court's determination that closing costs should not be excluded from the loss number. But Section 2255 generally "may not be employed to relitigate questions which were raised and considered on direct appeal," *Barton v. United States*, 791 F.2d 265 (2d Cir. 1986), and her Motion fails on this ground.

Petitioner appealed to the Eleventh Circuit, asserting that her sentence was unreasonable; more specifically, Petitioner claimed that the District Court had erred in calculating the applicable loss amount of her fraud in three ways:

(1) The sentencing court did not exclude $44,000 paid in closing costs associated with the HECM loan and failing to do so violated Application Note 3(D)(i) of § 2B1.1 which provides that "[l]oss shall not include. . . [i]nterest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs;"

(2) The sentencing court did not credit against her loss the fact that she satisfied a $115,000 mortgage on her property, which she claimed increased the property's value as collateral for the loan; and

(3) The sentencing court erred by concluding the loss amount was the same as the amount of restitution requested by the Government, i.e., employing the actual versus intended loss.

The Court of Appeals affirmed the sentence without hearing oral argument, addressing each of Petitioner's meritless claims:

(1) "With respect to Petitioner's first contention, the district court correctly concluded that Application Note 3(D)(i) of § 2B1.1 did not require it to exclude from the actual loss approximately $44,000 in closing costs that Petitioner paid when she secured the HECM loan in

2009. The purpose of that application note is to ensure that 'the offense level for a financial crime is not increased if the prosecution is delayed, even though the delay increases the cost of the crime.' Closing costs are not explicitly mentioned in Application Note 3(D)(i) and they do not qualify as 'other similar costs' within the meaning of that application note here because the closing costs were a fixed amount that was incurred only when the loan was originally taken out. Those costs would not have increased if the prosecution delayed bringing its case, so they do not fall within the scope of Application Note 3(D)(i);"

(2) "As for Petitioner's second contention, the district court did not clearly err when it refused to apply a credit against loss for the $115,000 payment that Petitioner made, as a condition to obtaining the HECM loan, to satisfy an existing mortgage on her property. Petitioner was entitled to (and received) a credit against loss for the approximately $216,000 that her lender recovered when the property was sold;" and

(3) "Finally, the district court did not clearly err when it determined that the loss amount would be the same as the amount of restitution that it was ordering. When the § 2B1.1(b)(1) loss amount is calculated based on actual loss instead of intended loss, as it was in this case, one would expect the amount of restitution and the loss amount to be the same."

*Pouparina*, 577 Fed. Appx. at 941 (some internal citations omitted). Petitioner's efforts to retread this familiar ground again before this Court must fail.

Also in Ground Five, Petitioner appears to blame sentencing counsel for not doing something to support what she refers to as a "multiple causation" argument, Motion at 15-18. Although it is not at all clear from Petitioner's motion what the supposed additional causes— other than her own fraudulent conduct—are for the loss in the case, it ultimately is not relevant because the guideline and commentary to which she cites is outdated and inapplicable. Prior

23

guidelines language and commentary included reference to a potential downward departure for "multiple causation." *See, e.g., United States v. Gregorio*, 956 F.2d 341, 345 (1st Cir. 1992) (quoting U.S.S.G. § 2F1.1, comment. (n. 10): "In a few instances, the total dollar loss that results from the offense may overstate its seriousness. Such situations typically occur when a misrepresentation ... is not the sole cause of the loss.... In such instances, a downward departure may be warranted."). Section 2F1.1 no longer exists. That closest current commentary provides: "There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted," and, by way of example, discusses a scenario in which multiple victims, each with a small loss, can result in a substantial total loss amount. *See* U.S.S.G. § 2B1.1, comment. (n. 20(C)). Petitioner was found guilty at trial of securing a loan through deceit in the amount of more than $400,000 from an unwitting lender. She used her position as a title agent and owner of a mortgage lending company to advance the fraud. She then broke up the fraudulent proceeds and deposited them into bank accounts in the names of her children and went on to spend portions of the ill-gotten funds. The actual loss attributed to her at sentencing was the loss to the mortgage lending company. Petitioner was actually credited for the amount recovered by the mortgage lending company via the short sale of the HECM Property. There is no alternate cause of the loss in Petitioner's case and the loss found applicable by the District Court in no way overstates the seriousness of Petitioner's offense.

Petitioner's Ground Five does nothing more than ask this reviewing Court to start from scratch and consider arguments as to the proper calculation of the loss amount attributable to her fraudulent conduct. But that has been done by the District Court and affirmed by the appellate court. It is long settled that a prisoner is procedurally barred from raising arguments in a motion

24

to vacate her sentence that she already raised and that were rejected in her direct appeal. *See United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th Cir. 2000) ("Once a matter has been decided adversely to a defendant on direct appeal it cannot be re-litigated in a collateral attack under section 2255."); *see also United States v. Rowan*, 663 F.2d 1034, 1035 (11th Cir. 1981) ("This Court is not required on § 2255 motions to reconsider claims of error raised and disposed of on direct appeal."). Nor does repackaging a claim as one based on "ineffective assistance" work to cure Petitioner's problem, for the essence of the claim she raises in Ground Five is the same as that raised at sentencing and again before the Court of Appeals—she is unhappy with the finding of the District Court. *See Nyhuis*, 211 F.3d at 1343 ("The petitioner has merely re-characterized his prior immunity claim as a due process claim. A rejected claim does not merit rehearing on a different, but previously available, legal theory.").

## V.     **CONCLUSION**

The five grounds Petitioner has raised to claim ineffective assistance of counsel are precisely the type of allegations—which are either "affirmatively contradicted by the record," constitute "unsupported generalizations," or are "patently frivolous"—that the Eleventh Circuit rejected in *Holmes*. 876 F.2d at 1553. Moreover, a hearing need not be held if the petition raises no legally cognizable claim, or if the factual matters raised by the petition may be resolved through the district court's review of the motions and the records in the case, or, in some circumstances, if the court, in its discretion, finds the movant's claims to be too "vague, conclusory or palpably incredible." *See Machibroda v. United States*, 368 U.S. 487, 495, 82 S. Ct. 510, 7 L. Ed. 2d 473 (1962)). As such, Petitioner's Motion should be denied absent a hearing in its entirety.

## VI.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2255 Proceedings provides that "[t]he district court must issue or deny a certificate of appealibility when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2).

Petitioner in this case has failed to make a substantial showing of the denial of a constitutional right, and, accordingly, this Court should deny a certificate of appealability in its final order.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 15, 2015, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF and notice was provided by certified mail

to the Pro Se Petitioner:

Yesenia Pouparina
Reg. No. 00408-104
Hazlton-USP
United States Penitentiary
Inmate Mails/Parcels
Post Office Box 2000
Bruceton Mills, WV  26525

/s/ Sandra L. Moser
SANDRA L. MOSER

# EXHIBIT A

FILED by TB D.C.

Aug 2, 2012

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## 12-20570-CR-SCOLA/BANDSTRA
### CASE NO. _____

18 U.S.C. § 1341
18 U.S.C. § 1343
18 U.S.C. § 2
18 U.S.C. § 981

UNITED STATES OF AMERICA

vs.

**YESENIA POUPARINA,**
a/k/a "Yesenia Campos,"

Defendant.
_____/

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times relevant to this Indictment:

1.    The Federal Housing Administration ("FHA") was a division of the United States Department of Housing and Urban Development ("HUD") that provided mortgage insurance to approved commercial lending institutions to enable low and moderate income home buyers to obtain loans to purchase homes.

2.    A Home Equity Conversion Mortgage ("HECM") was a FHA reverse mortgage program that enabled elderly people to withdraw some of their home's equity in order to give them greater financial security and allow them to afford to stay in their home.  To be eligible to receive a HECM, homeowners were required to, among other things: (1) be 62 years of age or older; (2) own the property outright or have paid down a considerable amount; and (3) occupy the property as a principal residence.  The amount of equity the borrower could obtain was the

lesser of the appraised value or the FHA HECM limit of $625,500.

3.      A HUD-1 Settlement Statement ("HUD-1") was a standard form required to be executed for the closing of real estate transactions. The HUD-1 Statement itemized for the lenders all aspects of the closing, including an itemized list of payments to be made by the borrower, money due to the seller, and any fees paid to third parties in connection with the closing.

4.      American Senior Lending ("ASL") was a Florida corporation doing business as a mortgage company with its principal place of business in Miami, Florida. ASL was a correspondent lender, which meant that ASL would handle the paperwork and receive the origination fee, relating to the mortgage, but another mortgage company would underwrite the loan.

5.      Entrust Title Services ("ETS") was a Florida corporation doing business as a title company with its principal place of business in Miami, Florida.

6.      Generation Mortgage Company ("GMC") was a California corporation doing business as a mortgage company with its principal place of business in Atlanta, Georgia. GMC had a warehouse line of credit with Texas Capitol Bank. GMC was a direct endorsement FHA HECM lender, which meant that the HUD allowed GMC to use its own personnel to approve HECMs that HUD insured, thereby protecting GMC in the event of default. After the loan closed, the loan file would be sent to HUD to ensure that all the required documents were submitted. HUD would endorse the loan, at which time the loan was insured.

7.      Defendant **YESENIA POUPARINA,** was a Miami-Dade county resident who worked as a title agent for ETS, beginning at least in or around January 2009 through at least in or around March 2012. In that capacity, **POUPARINA** assisted in the closing of HECM loans

–2–

and the disbursement of the excess cash-to-close proceeds.  **POUPARINA** was also the President of ASL.

8.      R.P., born in February 1939, was a Miami-Dade county resident and the relative of Defendant **YESENIA POUPARINA**.  R.P. continuously resided at 8899 SW 28th Street, Miami, Florida and received Section 8 Housing assistance since approximately in or around 1994.

9.      O.C. was a Miami-Dade county resident, and the President of ETS.  O.C. also worked as a loan officer at ALS, beginning at least in or around January 2009 through at least in or around March 2012.

10.     14210 SW 16th Terrace, Miami, Florida ("the Property") was a single family home.

11.     On or about July 26, 2000, **YESENIA POUPARINA** and O.C. purchased the Property as a single family home for approximately $247,000.

12.     On or about February 28, 2005, **YESENIA POUPARINA** and O.C. transferred the Property by quitclaim deed to **YESENIA POUPARINA** alone.

13.     On or about May 3, 2006, **YESENIA POUPARINA** sold the Property for $650,000.

14.     On or about October 16, 2007, **YESENIA POUPARINA** alone obtained title to the Property by quitclaim deed.

### COUNTS 1 THROUGH 4
### WIRE FRAUD
### (18 U.S.C. § 1343)

1.      Paragraphs 1 through 14 of the General Allegations section of this Indictment are re-alleged and incorporated as though fully set forth herein.

2.    From at least in or around October 2009 through at least in or around February 2012, the exact dates being unknown to the Grand Jury, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**YESENIA POUPARINA,**
**a/k/a "Yesenia Campos,"**

did knowingly and with intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and transmit and caused to be transmitted in interstate commerce, by means of wire communication, certain writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18 United States Code, Section 1343.

## PURPOSE OF THE SCHEME AND ARTIFICE

3.    It was the purpose of the scheme and artifice for the defendant to unlawfully enrich herself by, among other things: (a) using R.P. to apply for a HECM loan on the Property; (b) making it appear that R.P. owned and lived in the Property; (c) preparing and then submitting a false and fraudulent HECM application and supporting documents on behalf of R.P. to GMC and HUD; (d) diverting the HECM loan proceeds for her personal use and benefit; (e) making false and fraudulent statements to GMC and HUD to induce the approval of a short-sale on the Property to reduce the HECM balance; and (f) retaining the remaining HECM proceeds forgiven by the short-sale for her personal use and benefit.

## THE SCHEME AND ARTIFICE

4.    **YESENIA POUPARINA** caused an appraisal of the Property to be prepared, which was a necessary item for a HECM. The appraisal purported to value the Property at

−4−

approximately $600,000.

5.      **YESENIA POUPARINA** transferred the Property by quitclaim deed to R.P. to make it appear that R.P. was the owner. The quitclaim deed falsely and fraudulently purported to be signed by O.C., as a witness, and was falsely notarized.

6.      **YESENIA POUPARINA** prepared, and caused to be prepared, a false and fraudulent HECM application and other related documents purportedly on behalf of R.P., and submitted, and caused to be submitted, those documents to GMC. The HECM application included materially false and fraudulent representations that the Property had been R.P.'s principal place of residence for three years and that the charges and fees shown on the HUD-1 were to be paid by R.P.

7.      Based on the materially false and fraudulent representations in the HECM application submitted in the name of R.P., GMC approved the FHA HECM application and wired $405,188.63 in interstate commerce to ETS' escrow account to fund the loan.

8.      **YESENIA POUPARINA**, as the settlement agent, signed the closing documents, including, but not limited to, the closing instructions, and caused the HECM proceeds to be disbursed. **POUPARINA** used her married name, **"Yesenia Campos,"** when signing the settlement documents.

9.      In or around the time of the closing, **YESENIA POUPARINA** wrote a check from ETS' escrow account to herself in the amount of $362,265.91 (which represented the HECM proceeds minus closing fees), and deposited the check into her personal account. **POUPARINA** also personally obtained $9,424.77 that was paid to ASL and $4,345 that was paid to ETS for participating in the transaction.

10.     After the closing, R.P. purportedly transferred a life-estate in the Property by

–5–

quitclaim deed to **YESENIA POUPARINA**.

11.     **YESENIA POUPARINA** caused the Property to go into default and made false and fraudulent representations to GMC to induce the approval of a short sale of the Property.

12.     On or about February 7, 2012, **YESENIA POUPARINA** purchased the Property in a short sale for $242,500, which subsequently caused GMC to file a claim to HUD for the outstanding HECM loan balance of $207,966.54.

## EXECUTION OF THE SCHEME AND ARTIFICE

13.     On or about the dates specified as to each count below, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant, **YESENIA POUPARINA, a/k/a "Yesenia Campos,"** for the purpose of executing and in furtherance of the scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, did knowingly transmit and cause to be transmitted in interstate commerce, by means of wire communication, certain writings, signs, signals, pictures, and sounds, as more particularly described below:

| COUNT | APPROXIMATE DATE | DESCRIPTION OF WIRE COMMUNICATION |
|-------|------------------|-----------------------------------|
| 1 | December 2, 2009 | Wire transfer in the amount of $405,188.63, from Texas Capital Bank's account in Atlanta, Georgia to ETS' bank account at Wachovia in the Southern District of Florida to fund the HECM on the Property. |
| 2 | November 4, 2011 | Facsimile from the Pack & Ship Store in the Southern District of Florida to GMC in Atlanta, Georgia, discussing R.P.'s Power of Attorney. |
| 3 | November 23, 2011 | Facsimile from the Pack & Ship Store in the Southern District of Florida to GMC in Atlanta, Georgia, discussing that R.P. is out of the home and is now interested in a short-sale. |

Case 1:12-cr-20570-JEM   Document 1   Entered on FLSD Docket 08/03/2012   Page 7 of 11

| COUNT | APPROXIMATE DATE | DESCRIPTION OF WIRE COMMUNITCATION |
|-------|------------------|-----------------------------------|
| 4 | February 8, 2012 | Wire transfer to pay off the HECM on the Property in the amount of $216,329.31, from ETS' bank account at JP Morgan Chase in the Southern District of Florida to GMC's Fifth Third bank account in Cincinnati, Ohio. |

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT 5
## MAIL FRAUD
### (18 U.S.C. §1341)

1.     Paragraphs 1 through 14 of the General Allegations section of this Indictment are re-alleged and incorporated fully herein by reference.

2.     From at least in or around October 2009 through at least in or around February 2012, the exact dates being unknown to the Grand Jury, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**YESENIA POUPARINA,**
**a/k/a "Yesenia Campos,"**

did knowingly and with the intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and did knowingly cause to be delivered certain mail matter by the United States Postal Service according to the direction thereon, for the purpose of executing the scheme and artifice, in violation of Title 18, United States Code, Section 1341.

## PUPROSE OF THE SCHEME AND ARTIFICE

3.     It was the purpose of the scheme and artifice for the defendant to unlawfully enrich herself by, among other things: (a) using R.P. to apply for a HECM loan on the Property;

(b) making it appear that R.P. owned and lived in the Property; (c) preparing and then submitting a false and fraudulent HECM application and other supporting documents on behalf of R.P. to GMC and HUD; (d) diverting the HECM loan proceeds for her personal use and benefit; (e) making false and fraudulent statements to GMC and HUD to induce the approval of a short-sale and reduce the HECM balance on the Property; and (f) retaining the remaining HECM proceeds forgiven by the short-sale for her personal use and benefit.

## THE SCHEME AND ARTIFICE

4.     Paragraphs 4 through 12 of the Scheme and Artifice section of Counts 1 through 4 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

## EXECUTION OF THE SCHEME AND ARTIFICE

5.     On or about December 3, 2010, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant, **YESENIA POUPARINA, a/k/a "Yesenia Campos,"** for the purpose of executing and in furtherance of the aforesaid scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, did knowingly cause to be delivered certain mail matter, to wit: an Occupancy Certification dated November 17, 2010, from R.P. in Miami, Florida to GMC in Atlanta, Georgia, by the United States Postal Service, according to the direction thereon.

In violation of Title 18, United States Code, Sections 1341 and 2.

## FORFEITURE
### (18 U.S.C. § 981)

1.     The allegations of this Indictment are re-alleged and incorporated by reference as though fully set forth herein for the purposes of alleging forfeiture to the United States of

America of certain property in which the defendant, **YESENIA POUPARINA,** a/k/a "**Yesenia Campos,**" has an interest.

2.      Upon conviction of a violation of Title 18, United States Code, Section 1343 or 1341, as alleged in this Indictment, the defendant shall forfeit all of her right, title and interest to the United States in any property, real or personal, which constitutes or is derived from proceeds traceable to such violation, pursuant to Title 18, United States Code, Section 981(a)(1)(C).

3.      The property subject to forfeiture includes, but is not limited to:

a.      The sum of all proceeds the defendant derived from the offenses alleged in this Indictment;

b.      The contents of JP Morgan Chase bank account 2945396766;

c.      The contents of JP Morgan Chase bank account 2945396741; and,

d.      The contents of JP Morgan Chase bank account 2945396758.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) as made applicable by Title 28, United States Code, Section 2461(c), and the procedures set forth in Title 21, United States Code, Section 853.

A TRUE BILL

FO.

WIFREDO A. FERRER
UNITED STATES ATTORNEY

DENIS J. McINERNEY
Chief
MARY ANN McCARTHY
DOJ Trial Attorney
Criminal Division, Fraud Section

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

CASE NO. _____

vs.

CERTIFICATE OF TRIAL ATTORNEY*

YESENIA POUPARINA,
  a/k/a "Yesenia Campos,"

               Defendant.

_____/

Superseding Case Information:

Court Division: (Select One)

| | | New Defendant(s) | Yes _____ No _____ |
|---|---|---|---|
| X | Miami _____ Key West | Number of New Defendants _____ | |
| _____ | FTL _____ WPB _____ FTP | Total number of counts _____ | |

I do hereby certify that:

1.   I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.   I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.   Interpreter:   (Yes or No)   No
    List language and/or dialect _____

4.   This case will take  0  days for the parties to try.

5.   Please check appropriate category and type of offense listed below:

    (Check only one)               (Check only one)

| | | | | | |
|---|---|---|---|---|---|
| I | 0 to 5 days | X | Petty | | |
| II | 6 to 10 days | | Minor | | |
| III | 11 to 20 days | | Misdem. | | |
| IV | 21 to 60 days | | Felony | X | |
| V | 61 days and over | | | | |

6.   Has this case been previously filed in this District Court? (Yes or No)   No
If yes:
Judge: _____   Case No. _____
(Attach copy of dispositive order)
Has a complaint been filed in this matter?   (Yes or No)   No
If yes:
Magistrate Case No. _____
Related Miscellaneous numbers: _____
Defendant(s) in federal custody as of _____
Defendant(s) in state custody as of _____
Rule 20 from the _____   District of _____

Is this a potential death penalty case? (Yes or No)   No

7.   Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003? _____ Yes   X   No

8.   Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007? _____ Yes   X   No

_____
MARY ANN McCARTHY
DOJ TRIAL ATTORNEY
Court No. A5501634

*Penalty Sheet(s) attached

REV 4/8/08

Case 1:12-cr-20570-JEM   Document 1   Entered on FLSD Docket 08/03/2012   Page 11 of 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

Defendant's Name: YESENIA POUPARINA, a/k/a "Yesenia Campos"

Case No: _____

Counts #:  1-4

Wire Fraud _____

Title 18, United States Code, Section 1343 _____

* Max. Penalty:    20 years' imprisonment _____

Count #: 5

Mail Fraud _____

Title 18, united States Code, Section 1341 _____

*Max. Penalty:    20 years' imprisonment _____

Count #: _____

_____

_____

*Max. Penalty: _____

Count #: _____

_____

_____

*Max. Penalty: _____

*Refers only to possible term of incarceration, does not include possible fines, restitution,
special assessments, parole terms, or forfeitures that may be applicable.

# EXHIBIT B

| | |
|---|---|
| **From:** | McCarthy, Mary Ann |
| **To:** | "fquintero@quinterolaw.net" |
| **Subject:** | Yesenia Pouparina |
| **Date:** | Monday, April 16, 2012 2:51:33 PM |
| **Attachments:** | Yesenia Statement of Offense.pdf |
| | Plea Agreement - YESENIA POUPARINA (1).pdf |

Frank

I'm sorry again for the delay.  It has been difficult getting my supevision to review documents in a timely manner.  I'm attached my proposed plea agreement and statement of offense. I didn't want to wait any longer in sending these, but these are only drafts and are still subject to my supervision's approval.  I'm open to hearing your proposed negotiations.  I believe she has potential for 5K1.1 credit, and I also believe she has other criminal liability which we're continuing to investigate.  It is in her best interest to resolve this sooner rather than later.  Please let me know how you'd like to proceed.

I understand your office had my email slightly off – it's mary.ann.mccarthy@usdoj.gov -- so I have not received your emails to date.  Please resend if necessary.  Best number to reach me is 202-679-3099.

Thank you,
Mary Ann

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

UNITED STATES OF AMERICA

vs.

YESENIA POUPARINA,
        a/k/a "Yesenia Campos,"

        Defendant.

_____/

## PLEA AGREEMENT

The United States of America and YESENIA POUPARINA, a/k/a "Yesenia Campos," (hereinafter referred to as the "defendant") enter into the following agreement:

1.      The defendant agrees to plead guilty to Count 1 of the Information, which charges the defendant with wire fraud, in violation of Title 18, United States Code, Section 1343.

2.      The defendant agrees to a reasonable statement of offense to be filed with this plea agreement and agrees that those facts establish guilt of the offense charged beyond a reasonable doubt. The statement of offense, which is hereby incorporated into this plea agreement, constitutes a stipulation of facts for purposes of Section 1B1.2(a) of the Sentencing Guidelines.

3.      The defendant is aware that the sentence will be imposed by the Court after considering the Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing Guidelines"). The defendant acknowledges and understands that the Court will compute an advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by the Court relying in part on the results of a Pre-Sentence Investigation by the Court's Probation

Office, which investigation will commence after the guilty plea has been entered. The defendant is also aware that, under certain circumstances, the Court may depart from the advisory sentencing guideline range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines. The defendant is further aware and understands that the Court is required to consider the advisory guideline range determined under the Sentencing Guidelines, but is not bound to impose that sentence; the Court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory sentence. Knowing these facts, the defendant understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offenses identified in paragraph 1 and that the defendant may not withdraw the plea solely as a result of the sentence imposed.

4.     The defendant also understands and acknowledges that the Court shall impose a statutory maximum term of imprisonment of up to thirty (30) years, followed by a term of supervised release of up to five (5) years. In addition to a term of imprisonment and supervised release, the Court also may impose a fine of up to $1,000,000, and may also order restitution.

5.     The defendant further understands and acknowledges that, in addition to any sentence imposed under paragraphs 3 and 4 of this agreement, that restitution will be imposed as part of that sentence. The defendant agrees that for purposes of triggering the mandatory restitution provisions of Title 18, United States Code, Section 3663A, the offense to which the defendant is pleading guilty under this agreement in this case is an "offense against property" and was "committed by fraud and deceit," as those terms are understood within Title 18, United

2

States Code, Section 3663A(c)(1)(A)(ii). The defendant accordingly understands and acknowledges that as a result of her plea of guilty pursuant to the terms of the plea agreement in this case the Court must order that she pay restitution pursuant to the provisions of Title 18, United States Code, Sections 3663A and 3664. The defendant further understands and agrees that the United States will propose that $405,188.63 be entered as the restitution amount, based on information known to the United States at this time. Promptly following the entry of her guilty plea, the defendant agrees to take all necessary steps to make property available as partial satisfaction of any restitution order entered in this case.

6.     The defendant further understands and acknowledges that, in addition to any sentence imposed under paragraphs 3, 4 and 5 of this agreement, that forfeiture will be imposed as part of that sentence. The defendant agrees that the proceeds of the crime charged in the indictment total at least $405,188.63 and defendant agrees to the entry of a forfeiture money judgment in that amount. Further, defendant agrees to assist the United States in achieving such forfeiture, including through identification and turnover of assets. Further, the defendant agrees to forfeit the proceeds obtained through the execution of seizure warrants against the contents of JP Morgan Chase bank account 2945396766; JP Morgan Chase bank account 2945396741; and contents of JP Morgan Chase bank account 2945396758.

7.     The defendant knowingly and voluntarily waives any right to a jury trial or any other adversarial proceeding regarding the assets and waives any notification about forfeiture proceedings, whether administrative or judicial. The defendant further waives any statute of limitations with respect to the commencement of such forfeiture proceedings, whether

administrative or judicial.  The defendant also waives any defenses to the forfeiture, including

any claim of excessive fine or penalty under the Eighth Amendment.  The defendant also agrees

to waive any appeal of the forfeiture. The defendant further acknowledges that the property

forfeited cannot, either in whole or in part, be used to satisfy any obligation the defendant may

have for any federal, state or local taxes, interest and/or other penalties which may now exist or

which may come into existence.

   8. The defendant further understands and acknowledges that, in addition to any sentence

imposed under paragraph four (4) of this agreement, a special assessment in the amount of $100 will

be imposed on the defendant.  The defendant agrees that any special assessment imposed shall be

paid at the time of sentencing.

   9. The Office of the United States Attorney for the Southern District of Florida and the

Criminal Division of the United States Department of Justice (hereinafter "Office") reserves the right

to inform the Court and the Probation Office of all facts pertinent to the sentencing process,

including all relevant information concerning the offenses committed, whether charged or not, as

well as concerning the defendant and the defendant's background.  Subject only to the express terms

of any agreed-upon sentencing recommendations contained in this agreement, this Office further

reserves the right to make any recommendation as to the quality and quantity of punishment.

   10. This Office agrees that it will recommend at sentencing that the Court reduce by three

levels the sentencing guideline level applicable to the defendant's offense, pursuant to Section 3E1.1

of the Sentencing Guidelines, based upon the defendant's recognition and affirmative and timely

acceptance of personal responsibility.  However, this Office will not be required to make this

4

sentencing recommendation if the defendant: (1) fails or refuses to make full, accurate and complete disclosure to the Probation Office of the circumstances surrounding the relevant offense conduct; (2) is found to have misrepresented facts to the government prior to entering this plea agreement; or (3) commits any misconduct after entering into this plea agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

      11.     This Office and the defendant agree that, although not binding on the Probation Office or the Court, they will jointly recommend that the Court make the following findings and conclusions as to the sentence to be imposed:

      (a).     That the base offense level is seven (7) under U.S.S.G. § 2B1.1(a);

      (b).     Loss: That the parties agree that the defendant's loss will be calculated as the amount of the wire transmission related to this fraudulent Home Equity Conversion Mortgage scheme, and in no event more than $405,188.63. Therefore, the relevant amount of actual, probable or intended loss under Section 2B1.1(b)(1)(H) of the Sentencing Guidelines resulting from the offense committed in this case is more than $400,000 but less than $1,000,000, resulting in a 14-level enhancement;

      (c).     Abuse of a Position of Trust: That the defendant abused a position of public trust, as a title agent, in a manner that significantly facilitated the commission of the offense, under Section 3B1.3 of the Sentencing Guidelines, resulting in a two-level enhancement.

(d).   <u>Total Offense Level</u>: That the applicable offense level under all of the circumstances of the offense(s) committed by the defendant, and assuming a three-level departure for acceptance of responsibility under Section 3E1.1 of the Sentencing Guidelines, is Level 20.

12.   The defendant agrees to pay restitution and forfeiture as determined by the Court.

13.   The defendant agrees that she shall cooperate fully with this Office by:

(a).   providing truthful and complete information and testimony, and producing documents, records and other evidence, when called upon by this Office, whether in interviews, before a grand jury, or at any trial or other court proceeding;

(b).   appearing at such grand jury proceedings, hearings, trials, and other judicial proceedings, and at meetings, as may be required by this Office; and,

(c).   if requested by this Office, working in an undercover role to contact and negotiate with others suspected and believed to be involved in criminal misconduct under the supervision of, and in compliance with, law enforcement officers and agents.

14.   This Office reserves the right to evaluate the nature and extent of the defendant's cooperation and to make the defendant's cooperation, or lack thereof, known to the court at the time of sentencing. If in the sole and unreviewable judgment of this Office the defendant's cooperation is of such quality and significance to the investigation or prosecution of other criminal matters as to warrant the court's downward departure from the sentence required by the Sentencing Guidelines, this Office may at or before sentencing make a motion pursuant to Section 5K1.1 of the Sentencing Guidelines, 18 U.S.C. §3553(e), or a Rule 35 motion subsequent to sentencing, reflecting that the defendant has provided substantial assistance and recommending sentence reduction. The defendant

acknowledges and agrees, however, that nothing in this Agreement may be construed to require this Office to file such a motion and that this Office's assessment of the nature, value, truthfulness, completeness, and accuracy of the defendant's cooperation shall be binding on the defendant.

15.     The defendant understands and acknowledges that the court is under no obligation to grant a government motion pursuant to Title 18, United States Code, Section 3553(e), 5K1.1 of the Sentencing Guidelines or Rule 35 of the Federal Rules of Criminal Procedure, as referred to in paragraph fourteen (14) of this agreement, should the government exercise its discretion to file such a motion.

16.     The defendant is aware that the sentence has not yet been determined by the Court. The defendant also is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorney, this Office, or the Probation Office, is a prediction, not a promise, and is not binding on this Office, the Probation Office or the Court. The defendant understands further that any recommendation that this Office makes to the Court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the Court and the Court may disregard the recommendation in its entirety. The defendant understands and acknowledges, as previously acknowledged in paragraph three (3) above, that the defendant may not withdraw her plea based upon the Court's decision not to accept a sentencing recommendation made by the defendant, this Office, or a recommendation made jointly by both the defendant and this Office.

17.     In the event the defendant withdraws from this agreement prior to or after pleading guilty to the charges identified in paragraph one (1) above or otherwise fails to fully comply with any

7

of the terms of this plea agreement, this Office will be released from its obligations under this agreement, and the defendant agrees and understands that: (a) she thereby waives any protection afforded by any proffer letter agreement between the parties under Section 1B1.8 of the Sentencing Guidelines, Rule 11(f) of the Federal Rules of Criminal Procedure, and Rule 410 of the Federal Rules of Evidence, and that any statements made by her as part of plea discussions, any debriefings or interviews, or in this agreement, whether made prior to or after the execution of this agreement, will be admissible against her without any limitation in any civil or criminal proceeding brought by the government; and, (b) the defendant stipulates to the admissibility and authenticity, in any case brought by the United States in any way related to the facts referred to in this agreement, of any documents provided by the defendant or his representatives to any state or federal agency and/or this Office.

18.     The defendant is aware that Title 18, United States Code, Section 3742 affords the defendant the right to appeal the sentence imposed in this case. Acknowledging this, in exchange for the undertakings made by this Office in this plea agreement, the defendant hereby waives all rights conferred by Section 3742 to appeal any sentence imposed, including any restitution order, or to appeal the manner in which the sentence was imposed, unless the sentence exceeds the maximum permitted by statute or is the result of an upward departure from the guideline range that the Court establishes at sentencing. The defendant further understands that nothing in this agreement shall affect this Office's right and/or duty to appeal as set forth in Title 18, United States Code, Section 3742(b). However, if this Office appeals the defendant's sentence pursuant to Section 3742(b), the defendant shall be released from the above waiver of appellate rights. By signing this agreement, the

defendant acknowledges that she has discussed the appeal waiver set forth in this agreement with her attorney. The defendant further agrees, together with this Office, to request that the Court enter a specific finding that the defendant's waiver of her right to appeal the sentence to be imposed in this case was knowing and voluntary.

19.    This is the entire agreement and understanding between this Office and the defendant. There are no other agreements, promises, representations, or understandings.

WIFREDO A. FERRER
UNITED STATES ATTORNEY

Date: _____            By: _____
                                  MARY ANN McCARTHY
                                  TRIAL ATTORNEY


Date: _____            By: _____
                                  FRANK QUINTERO
                                  ATTORNEY FOR DEFENDANT


Date: _____            By: _____
                                  YESENIA POUPARINA
                                  DEFENDANT

9



# EXHIBIT C

| | |
|---|---|
| **From:** | McCarthy, Mary Ann |
| **To:** | "Frank Quintero" |
| **Subject:** | Yesenia Pouparina |
| **Date:** | Wednesday, April 18, 2012 5:18:05 PM |

Frank

Per our discussion today, I'm writing to you regarding our negotiations for a plea agreement for your client, Yesenia Pouparina.

As I addressed on the phone, these negotiations are subject to my supervisor's approval and are also contingent on Yesenia submitting to a proffer session and providing credible/truthful statements. This is intended to document our discussion and not as promise.

We discussed that the government is open to modifying the draft plea agreement from a 1349 conspiracy to a 371 conspiracy count. This would benefit Yesenia by capping the statutory maximum sentence at 5 years, instead of 20 years. It would also start the guideline range at 6 levels, rather than 7 levels.

We also discussed that the government is open to limiting Yesenia's loss amount for guideline purposes at less than $400,000, to account for the funds that were subtracted from the wire transfer to pay the fees for the HECM transaction. This would cap the loss amount for guidelines purposes at the amount that Yesenia obtained $362,265.91 from the HECM + the amounts that her companies received as payment for the transaction ($9424.77 + $4345) for a total loss for guidelines purposes of $376,035.68.

We also discussed that the government will request that Yesenia forfeit all monies associated with her crimes (including relevant conduct) and that she pay restitution in the amount that HUD and/or the lender is out, which we estimate is the difference between the balance owed to the bank and what the bank accepted as the short-sale price plus fees. Following the short-sale, Generation Mortgage made a claim to HUD for $207,966.54.

Yesenia also has the potential for 5K1.1 credit. We believe she can work on a proactive investigation, if she is credible and cooperative.

Last, we discussed that we're agreeable to a $100,000 personal surety bond at the time of surrender.

The amounts that were seized by the seizure warrant came from two accounts at JP Morgan Chase: $397.53 and $103,540.89. The third account was already liquidated at the time of the seizure.

Thanks,
Mary Ann McCarthy

# EXHIBIT D

| | |
|---|---|
| **From:** | Frank Quintero |
| **To:** | McCarthy, Mary Ann |
| **Cc:** | "yesenia pouparina" |
| **Subject:** | Yesenia Pouparina |
| **Date:** | Tuesday, April 24, 2012 11:00:42 AM |

Hi Mary Ann, I meant to get this email to you yesterday but I had to leave my office early and didn't get final approval from my client until after 5pm so I apologize. My client has decided to respectfully decline your offer but has authorized me to make the counter-offer set out below. Notwithstanding the foregoing, I have discussed with my client the original plea offer and statement of facts, as well as the revised plea offer (371 conspiracy charge) and the possible Guideline Sentence on both charges. After reviewing the documentary evidence, including all the documents that were submitted to the lender for the reverse mortgage I have found many inaccurate conclusions on the part of your investigators which at this moment there is no need to discuss since you may have decided to charge her based on the interpretation of that information by your investigators.

In an attempt to resolve this matter we propose the following counter-offer:

1) Ms. Pouparina will agree to cooperate with your investigators, including going undercover and wearing a wire, by contacting targets/subjects identified by your investigators and providing information on any subjects which have offered her involvement in any criminal activity. Of course she must receive full immunity for any of these activities done at the direction of the government.

2) Ms. Pouparina will agree to the entry of a civil forfeiture judgment on 50% of the seized funds (i.e. $50,000) within 10 days of signing an agreement reflecting this compromise. The remaining 50% would be refunded to her.

3) The government will agree not to charge her in the reverse mortgage case as long as her cooperation is substantial within the definition of DOJ Guidelines for cooperation.

As an observation, the government's case against Ms. Pouparina is not a strong one. I think this is only the second time I've seen the government go after someone who has paid off a mortgage. There are legal issues, as we have discussed, as to the amount of loss, as to whether there is even a loss, restitution, and even criminal intent. Over all I believe the parties are better off coming to a resolution where each side may not get everything they want but each side gets what they need.

Notwithstanding the above, if our counter-offer is rejected Ms. Pouparina stands ready to surrender at a date and time designated by you. Thank you for professionalism on this matter.

*Frank Quintero Jr.*
*Attorney at Law*
*Frank Quintero Jr. P.A.*
*2100 Ponce de Leon Blvd.*
*Suite 800*

*Coral Gables, Fl. 33134*
*Tel: 305-446-0303*
*Fax: 305-446-4503*
*E-Mail: fquintero@quinterolaw.net*
*Web: www.quinterolaw.net*



**This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. Section 2510-2521 and is legally privileged. Unauthorized review, use, disclosure or distribution is strictly prohibited. The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and as such is privileged and confidential. If you are not the intended recipient, please contact the sender by reply e-mail, and destroy all copies of the original message.**

 Please consider the environment before printing this e-mail.

# EXHIBIT E

| | |
|---|---|
| **From:** | McCarthy, Mary Ann |
| **To:** | Frank Quintero |
| **Subject:** | RE: Yesenia Pouparina |
| **Date:** | Thursday, June 7, 2012 5:52:00 PM |

Frank

Thanks for your email. I did not get your voicemail though — what number did you call? I just want to be sure you have the right number or there isn't a problem with my phone.

1. I will follow-up with Francisco Marty and find out if Osvaldo is in a position to authenticate the records. If so, I believe that is the best approach. Unless you're willing to stipulate to the authenticity of the copied records?

2. As of today, the government does not wish to enter into the counter offer that you and your client presented. We are open to further negotiations, however.

3. As you may well expect, the seizure affidavit was filed under seal and I am not going to provide it at this time. We will of course provide all relevant discovery in due time. If you feel you need any information about the seizure please feel free to reach out to me and we can may be able to work through these issues before you feel the need to file any such motion.

Thanks for your cooperation.
Best,


**Mary Ann McCarthy**
Trial Attorney

U.S. Department of Justice
Criminal Division, Fraud Section
Bond Building, Suite 3430
1400 New York Avenue, NW
Washington D.C. 20005
(202) 598-2240
mary.ann.mccarthy@usdoj.gov

---

**From:** Frank Quintero [mailto:fquintero@quinterolaw.net]
**Sent:** Thursday, June 07, 2012 9:41 AM
**To:** McCarthy, Mary Ann
**Cc:** 'yesenia pouparina'
**Subject:** Yesenia Pouparina

Mary Ann, I left you a message yesterday regarding the file you subpoenaed from Entrust Tile Services. Apparently there is no "original" file within the context that we use in describing original

documents. All original documents are in the hands of the originating lender. Entrust keeps copies of those documents so what I have in my office is a copy of the copy that Entrust has. I can have Yesenia execute the certificate of authenticity and give you the file that I have or you can have Frank Marty's client execute the certificate and I can have my copy of the file delivered to Marty and you can pick both up from him. Just let me know what you want to do.

On another note, I never heard back from you on the offer I made to resolve this matter. I assume that since you are proceeding with the grand jury that my offer is unacceptable. Please advise so I may formally tell my client the government's position.

Also at this time I am requesting a copy of the affidavit(s) in support of seizure warrants on all three accounts that were seized. If you will not provide these to me please advise so I may file a motion with the court. If I do not hear from you by 5pm today I will assume that you will not provide me with a copy of the affidavits and I will proceed to file the necessary motions.

Thank you.


*Frank Quintero Jr.*
*Attorney at Law*
*Frank Quintero Jr. P.A.*
*2100 Ponce de Leon Blvd.*
*Suite 800*
*Coral Gables, Fl. 33134*
*Tel: 305-446-0303*
*Fax: 305-446-4503*
*E-Mail: fquintero@quinterolaw.net*
*Web: www.quinterolaw.net*



**This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. Section 2510-2521 and is legally privileged. Unauthorized review, use, disclosure or distribution is strictly prohibited. The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and as such is privileged and confidential. If you are not the intended recipient, please contact the sender by reply e-mail, and destroy all copies of the original message.**

 Please consider the environment before printing this e-mail.

# EXHIBIT F

| | |
|---|---|
| **From:** | McCarthy, Mary Ann |
| **To:** | "Greg Chonillo" |
| **Subject:** | FW: Yesenia Pouparina |
| **Date:** | Wednesday, September 12, 2012 2:26:03 PM |

**Mary Ann McCarthy**
Trial Attorney

U.S. Department of Justice
Criminal Division, Fraud Section
Bond Building, Suite 3430
1400 New York Avenue, NW
Washington D.C. 20005
(202) 598-2240
mary.ann.mccarthy@usdoj.gov

---

**From:** fquintero@quinterolaw.net [mailto:fquintero@quinterolaw.net]
**Sent:** Wednesday, April 18, 2012 5:35 PM
**To:** McCarthy, Mary Ann
**Subject:** Re: Yesenia Pouparina

Thank you Mary Ann. I am out of the office but I will forward to Yesenia tomorrow and get
back to you by Friday.
BTW I believe the amount of the claim by the mortgage company to HUD is off by about
50K. The numbers don't add up. If you add the payoff to the claim amount it's well over
450K. The loan was for about 410K. Just making an observation.

In any event we'll talk Friday. Thanks again.
Sent via BlackBerry from T-Mobile

---

**From:** "McCarthy, Mary Ann" <Mary.Ann.McCarthy@usdoj.gov>
**Date:** Wed, 18 Apr 2012 17:18:04 -0400
**To:** Frank Quintero<fquintero@quinterolaw.net>
**Subject:** Yesenia Pouparina

Frank

Per our discussion today, I'm writing to you regarding our negotiations for a plea agreement for your
client, Yesenia Pouparina.

As I addressed on the phone, these negotiations are subject to my supervisor's approval and are also
contingent on Yesenia submitting to a proffer session and providing credible/truthful statements.
This is intended to document our discussion and not as promise.

We discussed that the government is open to modifying the draft plea agreement from a 1349 conspiracy to a 371 conspiracy count. This would benefit Yesenia by capping the statutory maximum sentence at 5 years, instead of 20 years. It would also start the guideline range at 6 levels, rather than 7 levels.

We also discussed that the government is open to limiting Yesenia's loss amount for guideline purposes at less than $400,000, to account for the funds that were subtracted from the wire transfer to pay the fees for the HECM transaction. This would cap the loss amount for guidelines purposes at the amount that Yesenia obtained $362,265.91 from the HECM + the amounts that her companies received as payment for the transaction ($9424.77 + $4345) for a total loss for guidelines purposes of $376,035.68.

We also discussed that the government will request that Yesenia forfeit all monies associated with her crimes (including relevant conduct) and that she pay restitution in the amount that HUD and/or the lender is out, which we estimate is the difference between the balance owed to the bank and what the bank accepted as the short-sale price plus fees. Following the short-sale, Generation Mortgage made a claim to HUD for $207,966.54.

Yesenia also has the potential for 5K1.1 credit. We believe she can work on a proactive investigation, if she is credible and cooperative.

Last, we discussed that we're agreeable to a $100,000 personal surety bond at the time of surrender.

The amounts that were seized by the seizure warrant came from two accounts at JP Morgan Chase: $397.53 and $103,540.89. The third account was already liquidated at the time of the seizure.

Thanks,
Mary Ann McCarthy

# EXHIBIT G

| | |
|---|---|
| **From:** | McCarthy, Mary Ann |
| **To:** | "Greg Chonillo" |
| **Subject:** | FW: Yesenia Pouparina |
| **Date:** | Wednesday, September 12, 2012 2:26:25 PM |

**Mary Ann McCarthy**
Trial Attorney

U.S. Department of Justice
Criminal Division, Fraud Section
Bond Building, Suite 3430
1400 New York Avenue, NW
Washington D.C. 20005
(202) 598-2240
mary.ann.mccarthy@usdoj.gov

**From:** Frank Quintero [mailto:fquintero@quinterolaw.net]
**Sent:** Tuesday, April 24, 2012 11:01 AM
**To:** McCarthy, Mary Ann
**Cc:** 'yesenia pouparina'
**Subject:** Yesenia Pouparina

Hi Mary Ann, I meant to get this email to you yesterday but I had to leave my office early and didn't get final approval from my client until after 5pm so I apologize. My client has decided to respectfully decline your offer but has authorized me to make the counter-offer set out below. Notwithstanding the foregoing, I have discussed with my client the original plea offer and statement of facts, as well as the revised plea offer (371 conspiracy charge) and the possible Guideline Sentence on both charges. After reviewing the documentary evidence, including all the documents that were submitted to the lender for the reverse mortgage I have found many inaccurate conclusions on the part of your investigators which at this moment there is no need to discuss since you may have decided to charge her based on the interpretation of that information by your investigators.

In an attempt to resolve this matter we propose the following counter-offer:

1) Ms. Pouparina will agree to cooperate with your investigators, including going undercover and wearing a wire, by contacting targets/subjects identified by your investigators and providing information on any subjects which have offered her involvement in any criminal activity. Of course she must receive full immunity for any of these activities done at the direction of the government.

2) Ms. Pouparina will agree to the entry of a civil forfeiture judgment on 50% of the seized funds (i.e. $50,000) within 10 days of signing an agreement reflecting this compromise. The remaining 50% would be refunded to her.

3) The government will agree not to charge her in the reverse mortgage case as long as her

cooperation is substantial within the definition of DOJ Guidelines for cooperation.

As an observation, the government's case against Ms. Pouparina is not a strong one. I think this is only the second time I've seen the government go after someone who has paid off a mortgage. There are legal issues, as we have discussed, as to the amount of loss, as to whether there is even a loss, restitution, and even criminal intent. Over all I believe the parties are better off coming to a resolution where each side may not get everything they want but each side gets what they need.

Notwithstanding the above, if our counter-offer is rejected Ms. Pouparina stands ready to surrender at a date and time designated by you. Thank you for professionalism on this matter.

*Frank Quintero Jr.*
*Attorney at Law*
*Frank Quintero Jr. P.A.*
*2100 Ponce de Leon Blvd.*
*Suite 800*
*Coral Gables, Fl. 33134*
*Tel: 305-446-0303*
*Fax: 305-446-4503*
*E-Mail: fquintero@quinterolaw.net*
*Web: www.quinterolaw.net*



**This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. Section 2510-2521 and is legally privileged. Unauthorized review, use, disclosure or distribution is strictly prohibited. The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and as such is privileged and confidential. If you are not the intended recipient, please contact the sender by reply e-mail, and destroy all copies of the original message.**

 Please consider the environment before printing this e-mail.

# EXHIBIT H

| | |
|---|---|
| **From:** | McCarthy, Mary Ann |
| **To:** | "Greg Chonillo" |
| **Subject:** | FW: Yesenia Pouparina |
| **Date:** | Wednesday, September 12, 2012 2:27:37 PM |
| **Attachments:** | Yesenia Statement of Offense.pdf |
| | Plea Agreement - YESENIA POUPARINA (1).pdf |

**Mary Ann McCarthy**

Trial Attorney

U.S. Department of Justice

Criminal Division, Fraud Section

Bond Building, Suite 3430

1400 New York Avenue, NW

Washington D.C. 20005

(202) 598-2240

mary.ann.mccarthy@usdoj.gov

---

**From:** McCarthy, Mary Ann
**Sent:** Monday, April 16, 2012 2:52 PM
**To:** 'fquintero@quinterolaw.net'
**Subject:** Yesenia Pouparina

Frank

I'm sorry again for the delay.  It has been difficult getting my supevision to review documents in a
timely manner.  I'm attached my proposed plea agreement and statement of offense. I didn't want
to wait any longer in sending these, but these are only drafts and are still subject to my
supervision's approval.  I'm open to hearing your proposed negotiations.  I believe she has potential
for 5K1.1 credit, and I also believe she has other criminal liability which we're continuing to
investigate.  It is in her best interest to resolve this sooner rather than later.  Please let me know
how you'd like to proceed.

I understand your office had my email slightly off – it's mary.ann.mccarthy@usdoj.gov -- so I have
not received your emails to date.  Please resend if necessary.  Best number to reach me is 202-679-
3099.

Thank you,
Mary Ann

# EXHIBIT I

| | |
|---|---|
| **From:** | Greg Chonillo |
| **To:** | McCarthy, Mary Ann |
| **Subject:** | Re: plea negotiations |
| **Date:** | Thursday, September 13, 2012 8:21:19 PM |

I will discuss this w my client and will get back to you on Wednesday.  I'm meeting with her Saturday to go over discovery.

Sent from my iPhone

On Sep 13, 2012, at 6:36 PM, "McCarthy, Mary Ann" <Mary.Ann.McCarthy@usdoj.gov> wrote:

> Greg,
>
> The government is open to a plea disposition in Yesenia Pouparina's case.  Here is what I believe to be the history of these discussions:
>
> Original Offer contingent which was contingent on my supervisor's approval and other factors:  April 16, 2012
>   Plead to One Count of Wire Fraud, 1343
>   Restitution to HUD
>   Forfeiture of $405,188.63
>   Base Level 7
>   Loss +14 ($400,000 to $1,000,000) - [this mistakenly included fees for the transaction]
>   Abuse of Position of trust +2
>   Acceptance - 3
>   Total Offense Level = 20
>
> Following further discussions with Frank Quintero on April 18, 2012 - Frank asked for the following and the government was open to:
>   Plead to One Count of 371
>   Restitution of $207,966.54 (claim to HUD after the short-sale)
>   Forfeiture of $405,188.63
>   Base Level 6
>   Loss +12 ($200,000 to $400,000) - based on loss excluding fees
>   Abuse of Position of Trust +2
>   Acceptance -3
>   Total Offense Level = 17
>
> Yesenia's counter offer on April 24, 2012, which we rejected on June 7, 2012:
> 1.    Yesenia will cooperate with full immunity
> 2.    Civil Forfeiture for 50% of the seized funds (approximately $50,000)
>
> The government's post-indictment offer, contingent of course on the standard plea agreement language and a truthful proffer/cooperation (I will be in Miami next week and we could line-up this proffer):
>
>   Plead to Count 1 of the Indictment
>   Restitution/Forfeiture
>   Base Level of 7
>   Loss Amount of $200,000 to $400,000 = +12
>   Abuse of Position of Trust = +2
>   Obstruction of Justice Adjustment = +2
>   Acceptance of Responsibility = -3
>   Total Offense Level = 20
>
> Please feel free to call me tomorrow at 202-598-2240 to discuss further.

> Thanks,
>
> Mary Ann McCarthy
> Trial Attorney
>
> U.S. Department of Justice
> Criminal Division, Fraud Section
> Bond Building, Suite 3430
> 1400 New York Avenue, NW
> Washington D.C. 20005
> (202) 598-2240
> mary.ann.mccarthy@usdoj.gov
>
>
>
>
>

# EXHIBIT J

| | |
|---|---|
| **From:** | Greg Chonillo |
| **To:** | McCarthy, Mary Ann |
| **Subject:** | RE: intended and actual loss calculations |
| **Date:** | Monday, October 1, 2012 11:48:23 AM |

Mary Ann:

I need a kastigar letter and a plea agreement detailing the amount of loss is where we requested between 70-and 120 with no enhancements if possible and allow her to argue for a variance and 5k1 language be included. Shes available to discuss information which according to her seems voluminous and will lead to several arrests. I am not available this wednesday but can be on thursday. Also, there was 70 or 75k seized that belonged to her daughter and she has proof that it was there prior to the investigation, any chance of an agreement to release those funds?

Greg Chonillo, Esquire
Chonillo Law Group, PLLC
7005 NW 41st Street
Miami, Florida 33166
Office: 786.361.1228
Fascimilie: 305.591.0160
Semail: greg@chonillo.mailstreet.com
Cellular: (954) 465-9316

This e-mail message and any attachments are confidential and may be attorney-client priviledged. Unauthorized disclosure or use of this information is strictly prohibited. If you are not the intended recipient of this message, please notify The Chonillo Law Group, PLLC immediately by telephone at 786. 360.1017 or by e-mail and destroy all copies of message and any attachments. Thank you.

-----Original Message-----
From: McCarthy, Mary Ann [mailto:Mary.Ann.McCarthy@usdoj.gov]
Sent: Fri 9/28/2012 11:32 AM
To: Greg Chonillo
Subject: Re: intended and actual loss calculations

Greg
I got your message. I'm going into GJ shortly but will call this afternoon. Can you meet next Wednesday OCT 3rd.

From: Greg Chonillo [mailto:greg@chonillo.mailstreet.com]
Sent: Wednesday, September 26, 2012 10:52 AM
To: McCarthy, Mary Ann
Subject: RE: intended and actual loss calculations

Even if we use the intended loss at 361, (the greater of the two) can we possibly agree that detection occurred after she sold or had the intention to sell the house then as such the amount of loss will go down see US v. Dowl, 619 F.3d 494 (5th Circuit 2010) and we can be within range.

Greg Chonillo, Esquire
Chonillo Law Group, PLLC
7005 NW 41st Street
Miami, Florida 33166
Office: 786.361.1228
Fascimilie: 305.591.0160

# EXHIBIT K

| | |
|---|---|
| **From:** | Greg Chonillo |
| **To:** | McCarthy, Mary Ann |
| **Subject:** | Re: Read: RE: intended and actual loss calculations |
| **Date:** | Wednesday, October 3, 2012 2:44:44 PM |

We really need something pretty soon please let me know

Sent from my iPhone

On Oct 2, 2012, at 6:32 PM, "McCarthy, Mary Ann" <Mary.Ann.McCarthy@usdoj.gov> wrote:

> I hope to have something to you in the next day or two.  It needs to be reviewed/approved first.
>
> Mary Ann McCarthy
> Trial Attorney
>
> U.S. Department of Justice
> Criminal Division, Fraud Section
> Bond Building, Suite 3430
> 1400 New York Avenue, NW
> Washington D.C. 20005
> (202) 598-2240
> mary.ann.mccarthy@usdoj.gov
>
>
>
>
>
> -----Original Message-----
> From: Greg Chonillo [mailto:greg@chonillo.mailstreet.com]
> Sent: Monday, October 01, 2012 9:55 PM
> To: McCarthy, Mary Ann
> Subject: Re: Read: RE: intended and actual loss calculations
>
> Mary
>
> Thanks I'll show it to my client
>
> Sent from my iPhone
>
> On Oct 1, 2012, at 7:07 PM, "McCarthy, Mary Ann" <Mary.Ann.McCarthy@usdoj.gov> wrote:
>
>> Greg
>>
>> I am out of the office tomorrow morning, but I will try to call you tomorrow afternoon.  I need to speak to a
>> supervisor, but I intend to get you a plea agreement (although it will not be quite what you're requesting below).
>>
>> Thanks,
>>
>> Mary Ann McCarthy
>> Trial Attorney
>>
>> U.S. Department of Justice
>> Criminal Division, Fraud Section
>> Bond Building, Suite 3430

>> 1400 New York Avenue, NW
>> Washington D.C. 20005
>> (202) 598-2240
>> mary.ann.mccarthy@usdoj.gov
>>
>>
>>
>>
>>
>> -----Original Message-----
>> From: Greg Chonillo [mailto:greg@chonillo.mailstreet.com]
>> Sent: Monday, October 01, 2012 5:49 PM
>> To: McCarthy, Mary Ann
>> Subject: Re: Read: RE: intended and actual loss calculations
>>
>> Mary Ann,
>>
>> Please let me know your position by tomorrow.  If we can't work this out I would like to finalize trial prep.
>>
>> Sent from my iPhone
>>
>> On Oct 1, 2012, at 11:49 AM, "McCarthy, Mary Ann" <Mary.Ann.McCarthy@usdoj.gov> wrote:
>>
>>> Your message
>>>
>>> To: McCarthy, Mary Ann
>>> Subject: RE: intended and actual loss calculations
>>> Sent: Monday, October 01, 2012 11:48:01 AM (UTC-05:00) Eastern Time (US & Canada)
>>>
>>> was read on Monday, October 01, 2012 11:49:03 AM (UTC-05:00) Eastern Time (US & Canada).
>>> <mime-attachment>

# EXHIBIT L

UNITED STATES OF AMERICA
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-CV-21050-JEM
(CRIMINAL CASE NO. 12-CR-20570-RWG)

YESENIA POUPARINA,

    *Movant,*

vs.

UNITED STATES OF AMERICA,

    *Respondent.*

_____/

## AFFIDAVIT OF GREG CHONILLO, ESQ.

Before me, the undersigned authority, appeared GREG CHONILLO, ESQ. (hereinafter "Affiant"), who first having been duly sworn according to law, deposes and states as follows:

1.    That Affiant was retained by Movant, Yesenia Pouparina ("Ms. Pouparina"), to represent her in her criminal case, *United States v. Yesenia Pouparina*, Case No. 12-cr-20570-RWG.

2.    That Affiant is a duly licensed member of the Florida Bar and has been practicing in this community for more than 14 years.

3.    On April 23, 2015, Ms. Pouparina filed a Motion to Vacate Pursuant to 28 U.S.C. § 2255, essentially an ineffective assistance of counsel claim. *See* D.E. #1.

4.    Ms. Pouparina alleges "MOVANT WAS DENIED THE EFFECTIVE ASSISTANCE DURING PLEA NEGOTIATIONS [.]" *See* D.E. #1, p. 5, Ground Two. She goes on to allege, "MOVANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL DURING THE TRIAL STAGES [.]" *See id* at ground 3.

5.    Specifically, Ms. Pouparina makes the following allegations:

   a.    that Mr. Chonillo said that the loss amount was $4,000, that if she went to trial, her sentencing range would be calculated at 0 to 6 months, and that Ms. Pouparina would be better off going to trial than accepting a plea offer;

   b.    that Mr. Chonillo failed to understand the basic structure and mechanics of the Sentencing Guidelines and was incapable of helping the defendant make reasonably informed decisions throughout the criminal process;

   c.    that counsel showed no interest in preparing for the case and only met with Ms. Pouparina for 30 minutes the weekend before trial;

   d.    that counsel required Ms. Pouparina to pay additional fees to enter documents needed to defend her at trial but that he did not enter those documents and was denied by the court when he attempted to enter a document;

   e.    that counsel did not allow Ms. Pouparina to testify;

   f.    that counsel did not prepare for or enter any documents related to forfeiture because counsel did not realize forfeiture was part of trial; and

   g.    that counsel ultimately abandoned the case.

6.    Ms. Pouparina's allegations are patently false.  On multiple occasions, *Affiant* discussed with and counseled Ms. Pouparina about her amount of loss and clearly explained that the law focuses on the intended amount of loss for sentencing purposes.  The amount of loss discussed by Ms. Pouparina above was an **example** counsel used to explain how the amount of loss calculation worked.  At *no point* did *Affiant* suggest or counsel Ms. Pouparina that her amount of loss was $4,000.00 or her sentencing range was 0-6 months.  Rather, on several occasions *Affiant* clarified and explained the amount of loss Ms. Pouparina was facing, which based upon the calculations exposed Ms. Pouparina to several years of prison time, and impressed upon her the grave risk she was taking electing to proceed to trial

7.    In fact, Mr. Alejandro De Varona, *Affiant*'s co-counsel also explained and counseled Ms. Pouparina that her amount of loss was substantial and she would be exposed to several years of prison time if she went to trial and was found guilty.  We both pressed and pleaded with her not to proceed to trial on several occasions.

8.      Additionally, *Affiant* and Ms. Pouparina reviewed all of the discovery throughout the course of several months beginning in August of 2012 and reviewed and prepared for actual trial a month in advance of the of the original trial date in September, 2012. However, the matter was continued until December, 2012 and the trial commenced on or about January, 2013. Once again, *Affiant* and Mr. De Varona began trial preparations one month early.

9.      Aside from *Affiant*, Mr. Alejandro De Varona was intimately involved in all trial preparations and reviewed trial strategy with Ms. Pouparina as well as counselled her not to proceed to trial. Ms. Pouparina's accusations of a 30 minute review period the weekend before trial are false.

10.     Ms. Pouparina did pay additional copy costs for documents that we initially believed would be used at trial. However, throughout the course of trial, the trial strategy changed and *Affiant* and Mr. De Varona opted not to use the copied documents. These changes in strategy were reviewed and approved by Ms. Pouparina throughout the course of the trial.

11.     *Affiant* and Mr. De Varona both counselled Ms. Pouparina against testifying. Both *Affiant* and Mr. Devarona set up a mock direct and cross-examination of Ms. Pouparina and believed that it was in her best interest if she didn't testify. However, at all times we expressed to Ms. Pouparina that ultimately the decision not to testify could not be made by counsel and that she retained the ultimate decision.

12.     *Affiant* and Mr. De Varona gave Ms. Pouparina the choice to have the forfeiture issue heard by the Jury or by the Judge which is customary and argument was made and based on the guilty verdict, after significant time deliberating the jury rendered the decision to forfeit her assets. *Affiant* and Mr. De Varona knew at all times that it was part of the trial.

13.     Even after the jury rendered its guilty verdict against Ms. Pouparina, *Affiant* argued with Judge Goldberg to allow Ms. Pouparina to remain on bond throughout the course of the Pre-Sentence Investigation and the Judge allowed her two weeks.

14.     At no point did *Affiant* or Mr. De Varona abandon Ms. Pouparina's case.  We consistently continued to represent her throughout trial and we were prepared to represent her throughout sentencing until we were replaced by her.  All throughout the course of representation, however, Ms. Pouparina remained a very difficult client.

15.     After the sentencing, Ms. Pouparina filed a bar complaint against the *Affiant*.  The *Affiant* filed his response where he attached an email where the message demonstrated that both the *Affiant* and his co-counsel pleaded with Ms. Pouparina not to proceed to trial.  However, Ms. Pouparina provided that she knew was "difficult" and aware of the risks but that "God" would see her through.  After our response, bar complaint was dismissed.   Unfortunately, our copy of the bar complaint response was destroyed and the bar's file was destroyed.

I, GREG CHONILLO, attest to the truthfulness of the claims made herein.

By:     _____
                      Affiant

State of Florida          }
                          }ss
County of Miami-Dade      }

Sworn to and subscribed before me this  5   day of  June  , 2015 by Greg Chonillo, Affiant, who is personally known/produced identification: _____.

BLANCA PADRON
MY COMMISSION # EE 141212
EXPIRES: October 24, 2015
Bonded Thru Notary Public Underwriters

My Commission Expires:                Notary Public
State of Florida at Large